## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| **ROBIN MCKINNEY AND JEFFREY MCKINNEY, ON BEHALF OF THEIR SON, BRICE D. MCKINNEY** | **CIVIL ACTION NO.: 20-1169** |
| **Plaintiffs** | **SECTION:  I(5)** |
| **VERSUS** | **JUDGE:  LANCE M. AFRICK** |
| **SUPERIOR VAN & MOBILITY, L.L.C. AND ELECTRONIC MOBILITY CONTROLS, L.L.C.** | **MAGISTRATE: MICHAEL NORTH** |
| **Defendants** | |

**PLAINTIFFS' MEMORANDUM IN OPPOSITION TO ELECTRONIC MOBILITY CONTROLS, L.L.C.'S MOTION FOR SUMMARY JUDGMENT AS TO THE PLAINTIFFS' PRODUCT DEFECT CLAIMS AND LACK OF CAUSATION**

**MAY IT PLEASE THE COURT:**

Plaintiffs, Robin McKinney and Jeffrey McKinney ("Plaintiffs"), on behalf of their son, Bryce D. McKinney ("Mr. McKinney"), through undersigned counsel, respectfully submit this Memorandum in Opposition to the Motion for Summary Judgment as to the Plaintiffs' Product Defect Claims and Lack of Causation (R. Doc. 40) filed on behalf of Defendant, Electronic Mobility Controls, L.L.C. ("EMC").  As Plaintiffs will demonstrate, this motion should be denied as there remain genuine issues of material fact that preclude summary judgment regarding the defective design of the AEVIT system, the defective construction and/or composition of the AEVIT system, whether the addition of the aluminum bar serves as a superseding cause of the collision to absolve EMC of liability, whether EMC's confusing installation manual contributed to the collision, and whether EMC's independent negligence as a maintenance provider contributed

to the collision.  For these reasons, as well as those more fully set forth herein, the Court should deny EMC's Motion for Summary Judgment as to the Plaintiffs' Product Defect Claims and Lack of Causation.

## I.  FACTUAL BACKGROUND

This case arises from a single-vehicle collision that occurred on October 16, 2019. Mr. McKinney, who is a quadriplegic with functional capability in his upper extremities, was operating a Ford Econoline E-150 van in the left lane on Interstate 12 when, suddenly and without warning, the van began to drift to the right, crossing the right lane and ultimately colliding with a tree on the right shoulder. Superior Van & Mobility, L.L.C. ("Superior") equipped the McKinney vehicle with an Advanced Electronic Vehicle Interface Technology ("AEVIT") system manufactured by Electronic Mobility Controls, L.L.C. ("EMC").   Superior performed maintenance on the McKinney vehicle and regularly instructed Plaintiffs on how Plaintiffs should respond to warnings and/or fault codes. Superior and EMC collaborated in response to multiple maintenance visits, which required analysis of data downloaded from the AEVIT system.

Plaintiffs have alleged defects in warnings, construction/composition, and design, as well as breaches of express warranty and the warranty against redhibitory defects.[1] Plaintiffs further alleged that Superior's instructions were inadequate and/or conflicted with EMC's warnings, that Superior's installation of the AEVIT system caused defects in the McKinney vehicle, and that the maintenance activities of Superior and EMC fell below the standard owed to Plaintiffs.[2]

As a result of Defendants' negligence and breaches of duties owed to Plaintiffs under Louisiana law, the McKinney vehicle's modified braking system failed to properly operate,[3]

---

[1] *See* R. Doc. 1-2, Plaintiffs' Petition for Damages. The parties have since stipulated that Plaintiffs will not pursue a failure to warn claim, a breach of express warranty claim, or a redhibition claim against EMC.
[2] *Id.*
[3] R. Doc. 40-8, Expert Report of Wayne McCracken.

causing Mr. McKinney to sustain severe injuries in the collision and requiring him to undergo multiple surgeries over the course of his month-and-a-half hospital stay. Mr. McKinney's parents, Robin and Jeffrey McKinney, filed suit on his behalf against Superior and EMC to recover for the injuries and damages he sustained as a result of the defective conditions of the van equipped with the AEVIT system.[4]

Since the commencement of litigation, the parties have conducted extensive discovery, including written requests and interrogatories, depositions, and inspections of the vehicle. The evidence in the record shows that EMC failed to conduct any failure mode an effects analysis ("FMEA") on the version of the AEVIT system installed in the McKinney vehicle or on any prior versions of the AEVIT system to determine what would happen in the event of a complete system failure or to design safeguards against such a scenario.[5] The roller connected to the servomotor that compressed the brake pedal in the McKinney vehicle was made out of plastic, as opposed to a sturdier material, and was installed in such a way that caused the roller to wear away over time.[6] The misalignment of the plastic roller can be attributed to the confusing and inadequate instructions in EMC's installation manual that instruct the installer to align components of the braking system by eyeballing the angles of a clock face without giving any frame of reference in the footwell of the vehicle.[7] While EMC certifies in its installation manual that modified vehicles shall meet the Federal Motor Vehicle Safety Standards ("FMVSS") after installation of the AEVIT system,[8] EMC conducts no testing of vehicles whatsoever after the AEVIT system is installed to

---

[4] R. Doc. 1-2, Plaintiffs' Petition for Damages.
[5] Exhibit 1, 30(b)(6) Deposition Testimony of EMC ("Nuza Dep."), at 39:19–40:6, 95:16–96:18; *see also* Exhibit 1, Nuza Dep., 39:5–9.
[6] Exhibit 2, Deposition Testimony of Wayne McCracken ("McCracken Dep."), at 56:5–15; 59:13–23, 60:10–62:11, 201:9–202:14.
[7] Exhibit 2, McCracken Dep., at 70.
[8] Exhibit 1, Nuza Dep., at 192:22–193:3 (referencing EMC00746).

ensure compliance, unless EMC performs the installation.[9] EMC does not require its dealers to measure the braking capabilities of vehicles once the AEVIT system is installed; it simply asks dealers to perform a fifty-mile test drive.[10] No document exists to show that the McKinney vehicle's braking capabilities were measured after the installation of the AEVIT system and before Plaintiffs took possession of the vehicle.[11] Therefore, EMC cannot certify that the McKinney vehicle still met the minimum braking requirements of the FMVSS after the AEVIT system was installed.[12]

EMC now moves for summary judgment on multiple issues, all of which are genuinely disputed by evidence in the record as discussed further below.

## II.   LAW AND ARGUMENT

### A. Summary Judgment Standard

A defendant is not entitled to summary judgment on a plaintiff's claims unless the defendant can demonstrate that there is no genuine issue as to any material fact. Fed. R. Civ. P. 56(a). A defendant must support its assertion of undisputed material facts by citing to the case record or showing that the plaintiff cannot produce admissible evidence to support a material fact at issue. Fed. R. Civ. Proc. 56(c). The substantive law applicable to the case identifies the material facts for purposes of the summary judgment motion. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). When assessing whether a genuine dispute of material facts exists, the court considers "all of the evidence in the record but refrain[s] from making credibility determinations or weighing the evidence." *Delta & Pine Land Co. v. Nationwide Agribusiness Ins. Co.*, 530 F.3d 395, 398 (5th Cir. 2008) (citing *Reeves v. Sanderson Plumbing Prod., Inc.*, 530 U.S. 133, 150

---

[9] Exhibit 1, Nuza Dep., at 69:13–22.
[10] Exhibit 1, Nuza Dep., at 45:22–46:6.
[11] Exhibit 1, Nuza Dep., at 69:8–17; Exhibit 3, 30(b)(6) Deposition Testimony of Superior, ("Angelloz Dep."), at 47:7–48:19.
[12] Exhibit 1, Nuza Dep., at 195:8–19.

(2000)).  The court "must draw all reasonable inferences in favor of the nonmoving party," *Reeves*, 530 U.S. at 150, and it ultimately must be satisfied that "a reasonable jury could not return a verdict for the nonmoving party."  *Delta & Pine Land Co.*, 530 F.3d at 399.  The trial court should act with caution in granting summary judgment and may deny the motion in a case in which "there is reason to believe that the better course would be to proceed to a full trial." *Anderson*, 477 U.S. at 255 (citing *Kennedy v. Silas Mason Co.,* 334 U.S. 249 (1948)).

**B. Summary judgment is inappropriate because there remain genuine issues of material fact as to the defective design of the AEVIT system.**

Under the Louisiana Products Liability Act ("LPLA"), a plaintiff must show "that the defendant is the manufacturer of the product; the claimant's damage was proximately caused by a characteristic of the product; this characteristic made the product unreasonably dangerous; and the claimant's damage arose from a reasonably anticipated use of the product." *Flagg v. Stryker Corp.*, 647 F. App'x 314, 316 (5th Cir. 2016) (citations omitted). The LPLA provides four theories by which a plaintiff can establish a product was unreasonably dangerous: "(1) the product's construction or composition is defective, (2) the product's design is defective, (3) the product's warnings are inadequate, or (4) by showing a breach of express warranty." *Id.* (citing *Demahy v. Schwarz Pharma, Inc.*, 702 F.3d 177, 182 (5th Cir. 2012); La. Stat. Ann. § 9:2800.52; La. Stat. Ann. § 9:2800.54).

To prove a product was defective in design under the LPLA, a plaintiff must show that (1) an alternative design existed to prevent the plaintiff's damages and (2) the risk of the product's design causing grave damage outweighed the manufacturer's burden adopting the alternative design and any adverse effect on product utility. *See* La. Stat. Ann. § 9:2800.56. EMC claims that Plaintiffs cannot prove the AEVIT system was unreasonably dangerous in design. However, genuine issues of material fact remain as to whether a different material could have been used for

the roller on the gas/brake servomotor, whether EMC should have required post-installation testing and measurement of safety critical braking capability as part of its installation directions to dealer-installers, and whether EMC failed to adequately test the AEVIT system.

Plaintiffs' liability expert, L. Wayne McCracken, Jr., P.E., obtained his Bachelor of Science degree in electrical engineering from Duke University and is a registered professional engineer in multiple states.[13] Mr. McCracken has taken numerous courses over the years in subjects involving engineering, maintenance, automotive/motorcycle and accident reconstruction.[14] He has extensive experience in internal combustion technology, particularly motorcycles heavy trucks, and automobiles, with a working knowledge of motor vehicle accident reconstruction, vehicle dynamics, and failure analysis.[15] His involvement in the motor vehicle industry dates back almost five (5) decades, where he regularly corresponded with motorcycle manufacturers on design and installation issues in his capacity as head of the service department and machine shop for motorcycle dealerships.[16] Since leaving the motorcycle industry, Mr. McCracken has practiced as an engineer involved in accident reconstruction and consulting engineering for over thirty (30) years.  He has evaluated engineering principles related to design, installation, construction, composition, reconstruction, braking and dynamics/control issues in thousands of cases over his career. EMC has filed a separate motion in limine seeking to exclude the testimony of Mr. McCracken,[17] and Mr. McCracken's qualifications, as well as the methods upon which he relied to reach his conclusions in this case, are addressed more fully in Plaintiffs' opposition to that motion.[18]

---

[13] Exhibit 4, Curriculum Vitae of L. Wayne McCracken, Jr., P.E. ("McCracken CV") (previously attached as Exhibit C to McCracken Dep.).
[14] *Id.*; *see also* Exhibit 2, McCracken Dep., at 8–13.
[15] Exhibit 4, McCracken CV.
[16] Exhibit 2, McCracken Dep., at 28, 373.
[17] *See* R. Doc. 44.
[18] *See* R. Doc. 56.

In this case, Mr. McCracken has reviewed thousands of pages of documents and photographs, including photographs of the plastic roller connected to the gas/brake servo motor responsible for pushing down the brake pedal when the brakes are engaged. Photographs of this roller showed a wear pattern that indicates erosion of the material over a significant period of time.[19] Mr. McCracken explained that the roller was installed in such a way that caused it to rub unevenly on the modified brake pedal resulting in wearing away the plastic on the roller, which contributed to the McKinney vehicle's lack of braking capability.[20]

EMC selectively quotes portions of Mr. McCracken's deposition testimony to support the contention that Mr. McCracken cannot point to a "particular EMC part which was defective in design or identify an alternative design for an alleged defectively designed particular EMC part."[21] However, EMC fails to include the entirety of Mr. McCracken's answers in its memorandum in support:

> Q: You can tell me if you believe there was a piece that was improperly designed or improperly manufactured, and you can't do that at this point?
>
> A: Designed or manufactured, you're right. I don't think I can do that. Definitely, you could have designed something as far as this roller that had better wear characteristics to it, but whether you actually needed to do that to make the system perform properly if it were properly installed, that's a different question.
>
> Q: Let me ask you about the roller. What have you done to determine about what alternative designs there could be for the roller?
>
> A: The ruler [sic] could've been made out of a much more substantial material.
>
> Q: What was this roller made out of?

---

[19] Exhibit 2, McCracken Dep., at 56:5–59:23, 60:10–62:11, 201:9–202:14; Exhibit 5, Photographs of Plastic Roller (previously attached as Exhibit T to McCracken Dep.).
[20] Exhibit 2, McCracken Dep., at 60:10–61:14.
[21] R. Doc. 40-1 at 8.

A:      Plastic of some sort.

Q:      Do you know what this roller was made of?

A:      No, I have not seen any chemical analysis of the roller. But you don't have to use a roller here, plastic roller. You could have used a roller bearing, for example, or even a ball bearing perhaps. It would have been a little more expensive, but a lot less chances for any significant wear.

Q:      All these options we've just discussed, have you tested to see if any of these options would actually work?

A:      I have not. [22]

While Mr. McCracken did not himself conduct any testing to determine the success of these other options, testing is not required to know that a metal roller bearing will sustain less wear over time than a plastic roller. The lack of testing crucial to this case is EMC's complete failure to (a) conduct any type of testing to determine what would happen should the AEVIT system fail or (b) require post-installation testing (as part of its design of the installation manual) to ensure that a vehicle with the AEVIT system, particularly a Ford Econoline E-150 van like the McKinney vehicle, would still meet the original equipment manufacturer ("OEM") maximum braking capability, or, at the very least, the FMVSS, after installation.

While there is no cognizable claim for failure to test under the LPLA, The United States Court of Appeals for the Fifth Circuit has recognized that a plaintiff can use evidence of a defendant's failure to test to establish that a product was unreasonably dangerous in either construction or design: "The LPLA does not recognize a cause of action for failure to test or failure to equip, except insofar as the failure to test or equip renders the product unreasonably dangerous." *MacDonald v. Monsanto*, No. 95-40133, 68 F.3d 470, 1995 WL 581942, at *1 (5th Cir. 1995); *see also In re FEMA Trailer Formaldehyde Prod. Liab. Litig.*, No. MDL 07-1873, 2009 WL 2382773,

---

[22] Exhibit 2, McCracken Dep., at 243:4–244:9.

at *3 (E.D. La. July 23, 2009). The Fifth Circuit reasoned that a plaintiff could prove a product was defective by identifying "a particular test which was done improperly or which was not done on the product, and which would have produced results which would have prevented [the plaintiff's] injuries." *MacDonald*, 1995 WL 581942, at *3 (ultimately affirming district court's grant of summary judgment in favor of defendants because plaintiffs failed to introduce such evidence).

In their First Set of Interrogatories to EMC, Plaintiffs asked EMC to state whether EMC had "conducted any crash tests to determine the possibility and/or probability that the AEVIT system may fail particularly in regard to the steering and/or braking controls,"[23] to which EMC responded that it had "not performed any crash test in any way related to the AEVIT system."[24] In their First Request for Production of Documents to EMC, Plaintiffs requested "[a]ll failure mode and effects analyses (FMEA) and/or failure analysis studies (or the name Defendant used to properly identify these studies or functions in lieu of the assumed names stated in this request) concerning the AEVIT system,"[25] to which EMC objected "on the grounds it is vague and ambiguous as to the term 'failure mode and effects analysis.'"[26] Plaintiffs also requested the same failure mode and effects analysis information related to the potential failure of the AEVIT system's steering and/or braking controls,[27] to which EMC made the same objection.[28] However, at his deposition as EMC's corporate representative pursuant to Rule 30(b)(6) of the Federal Rules of Civil Procedure, Phillip Nuza ("Mr. Nuza") testified that he was familiar with and understood the

---

[23] Exhibit 6, Plaintiffs' First Set of Interrogatories to Defendant, Electronic Mobility Controls, L.L.C. ("Plaintiffs' Interrogatories"), at 7.
[24] Exhibit 7, Electronic Mobility Controls, L.L.C.'s Answers to Plaintiffs' First Set of Interrogatories and Request for Production of Documents (EMC's Discovery Responses"), at 10–11.
[25] Exhibit 8, Plaintiffs' First Request for Production of Documents to Defendant, Electronic Mobility Controls, L.L.C ("Plaintiffs' Request for Production"), at 7.
[26] Exhibit 7, EMC's Discovery Responses, at 24.
[27] Exhibit 8, Plaintiffs' Request for Production, at 7–8.
[28] Exhibit 7, EMC's Discovery Responses, at 24.

term "failure mode and effects analysis"[29] and that EMC did not conduct any kind of failure mode and effects analysis on the AEVIT 2.0 system (i.e., the version installed in the McKinney vehicle) or on any prior versions of the AEVIT system.[30] In fact, EMC has no idea what happens in the event of a complete failure of the AEVIT system.[31]

Mr. Nuza testified that the AEVIT system has no fail-safe mode or mechanism because, according to EMC, the AEVIT system simply cannot fail.[32] EMC did not conduct any crash tests related to the potential failure of the AEVIT system.[33] EMC does not maintain a database to accumulate reports of adverse events, nor does it keep a centralized report of error codes that occur in vehicles with the AEVIT system.[34] EMC has no policy requiring its dealers to report adverse events, system failures, and/or component failures to EMC.[35] Taken together with EMC's lack of testing, this evidence paints a picture of deliberate ignorance as to deficiencies in the AEVIT system.

EMC further failed to conduct (or design as a requirement in the installation manual) any testing to determine whether a vehicle, like Mr. McKinney's Ford Econoline E-150 van, would still meet the FMVSS after installation of the AEVIT system. EMC conducts no testing of vehicles whatsoever after the AEVIT system is installed, unless EMC performs the installation in-house.[36] In such a case, EMC allegedly will test the braking functionality of the vehicle to ensure that it is the same or better than the original equipment manufacturer braking capability.[37] However, EMC does not require its certified EMC dealers to perform such a test; EMC merely requires that the

---

[29] Exhibit 1, Nuza Dep., at 95:16–25.
[30] Exhibit 1, Nuza Dep., at 39:19–40:6, 95:16–96:18.
[31] Exhibit 1, Nuza Dep., at 39:5–9.
[32] Exhibit 1, Nuza Dep., at 37:3–38:18.
[33] Exhibit 1, Nuza Dep., at 96:19–23.
[34] Exhibit 1, Nuza Dep., at 101:24–102:17.
[35] Exhibit 1, Nuza Dep., at 203:2–12.
[36] Nuza 69:13–22.
[37] Exhibit 1, Nuza Dep., at 70:21–71:2.

dealer complete a 50-mile test drive of the vehicle.[38] While EMC also requires dealers to complete a Warranty Validation form,[39] nowhere on this form does it indicate that dealers are required by EMC to measure the braking capability of a given vehicle or that EMC and/or Superior measured the braking capability of the McKinney vehicle prior to Mr. McKinney taking possession.[40] The form does appear to require the certified EMC dealer to perform a "dynamic accelerator and brake test."[41] Yet Stephen Angelloz, a general manager of Superior who underwent training on the AEVIT system at EMC headquarters both in Louisiana and Maine,[42] testified that he did not know what a dynamic accelerator and brake test was.[43] Most importantly, due to a lack of testing, EMC cannot certify that the McKinney vehicle still met the minimum braking requirements of the FMVSS after the AEVIT system was installed.[44]

Mr. McCracken, both in his report and at his deposition, was understandably critical of EMC's lack of FMEA, a common test performed when applying proper engineering design standards in the manufacturing industry, to determine what happens in the event the system fails and to develop safety procedures to accommodate such failures:

> EMC designed this whole system. They fabricated it. They had to test it. You can't come up with something like this without testing. Come on. It makes no sense. You're about to put this out in public through a company that is selling this stuff. The fact that you didn't test it is ridiculous. So, did they test it? They had to. I can't imagine a company putting something like that out without testing it. It makes no sense. It's almost criminal. I won't go that far, but it's

---

[38] Exhibit 1, Nuza Dep., at 45:22–46:6.
[39] Exhibit 1, Nuza Dep., at 71:8–18; Exhibit 9, EMC Warranty Documents (previously attached as Exhibit 10 to Nuza Dep.), at SUPERIOR VAN 00007.
[40] Exhibit 9, EMC Warranty Documents, at SUPERIOR VAN 00007.
[41] *Id.*
[42] Exhibit 3, Angelloz Dep., at 18:20–19:14, 21:4–9.
[43] Angelloz 179:2–6.
[44] Exhibit 3, Angelloz Dep., at 195:8–19.

close. Without testing, it would be almost criminal. So, that's what
I've got to say. [45]

Mr. McCracken also expressed criticism of EMC's failure to test the braking capability of vehicles,
particularly the McKinney vehicle, once the AEVIT system is installed.[46]

In the case before this Court, EMC could have easily tested the braking capacity of the
McKinney vehicle after installation of the AEVIT system or instructed Superior, its certified
dealer, to conduct such a test. Mr. McCracken testified that an individual could determine the
braking capabilities of a vehicle by simply downloading an accelerometer system onto a
smartphone and testing the brakes of the vehicle on various surfaces.[47] The record is devoid of any
evidence that EMC conducted (or required of its dealers) this type of basic testing on Ford
Econoline E-150 vans generally before selling the AEVIT system to be installed in such vehicles.

EMC's failure to conduct FMEA on the AEVIT system installed in the McKinney vehicle,
as well as EMC's failure to conduct testing to ensure the McKinney vehicle still met the FMVSS
requirements after installation of the AEVIT system, rendered the AEVIT system defective in its
design. Such testing, more likely than not, would have detected the defects in the McKinney
vehicle's braking capabilities and prevented the collision in which Mr. McKinney was injured.[48]
Consequently, EMC should be held liable for defectively designing the AEVIT system under the
LPLA. The evidence in the record, as stated above, contains genuine issues of material fact as to

---

[45] Exhibit 2, McCracken Dep., at 186:3–15; *see also* Exhibit 2, McCracken Dep., at 238:7–239:15, 256:24–257:10; R. Doc. 40-8, Expert Report of Wayne McCracken, at 7.

[46] Exhibit 2, McCracken Dep., at 49:22–50:14, 111:10–22, 112:2–13, 117:12–20, 124:13–125:11, 142:10–143:13, 341:23, 352:21–354:8; *see also* R. Doc. 40-8, Expert Report of Wayne McCracken, at 6.

[47] Exhibit 2, McCracken Dep., at 16:20–17:6; *see also* R. Doc. 40-8, Expert Report of Wayne McCracken, at 6.

[48] Because EMC had the opportunity to preserve such information, by prescribing that measurements be taken after installation of the AEVIT system, EMC cannot now contend or point to any data that shows the McKinney vehicle ever met the FMVSS requirements.  Unfortunately, Plaintiffs' expert does not have a time machine to go back and test the pre-incident condition of the vehicle.

whether the AEVIT system was defective in design, and EMC's motion for summary judgment on this issue should be denied.

C. **Summary judgment is inappropriate because there remain genuine issues of material fact as to the defective construction and/or composition of the AEVIT system installed in the McKinney vehicle.**

To prove a product was defective in construction or composition under the LPLA, a plaintiff must "(i) set forth the manufacturer's specifications for the product and (ii) demonstrate how the product materially deviated from those standards so as to render it unreasonably dangerous." *Roman v. W. Mfg., Inc.*, 691 F.3d 686, 698 (5th Cir. 2012) (citing *Jenkins v. Int'l Paper Co.*, 41,566 (La. App. 2 Cir. 11/15/06), 945 So. 2d 144, 150; *Grenier v. Med. Eng'g Corp.*, 99 F. Supp. 2d 759, 764 (W.D. La. 2000), *aff'd*, 243 F.3d 200 (5th Cir. 2001)) (internal quotations omitted). As stated above, evidence of a defendant's failure to adequately test a product can be used to support a plaintiff's claims of defective design and/or construction. *MacDonald*, 1995 WL 581942, at *1, *3; *In re FEMA Trailer Formaldehyde Prod. Liab. Litig.*, 2009 WL 2382773, at *3.

At his deposition as corporate representative of EMC, Mr. Nuza testified that the installation manual of the AEVIT system certifies compliance with the applicable safety standards.[49] In particular, the installation manual states that "the installation of all EMC products, as well as the performance of the modified vehicle shall comply with all applicable Society of Automotive Engineering Standards, SAE, all applicable federal motor vehicle safety standards, FMVSS, and all ECE regulations, [and] European standards."[50] The installation manual then provides a list of regulations with which the AEVIT system is supposed to comply after installation in a given vehicle.[51] The installation manual specifically states that the AEVIT system and the

---

[49] Exhibit 1, Nuza Dep., at 191:25–195:23.
[50] Exhibit 1, Nuza Dep., at 192:22–193:3 (referencing EMC Installation Manual at EMC00746); *see also* Exhibit 7, EMC's Discovery Responses, at 28 (producing EMC Installation Manual (EMC00678–00749)).
[51] Exhibit 10, Excerpts of EMC Installation Manual, at EMC00746.

vehicle in which it is installed shall comply with FMVSS 105, which pertains to Hydraulic and Electric Brake Systems.[52] In their First Request for Production of Documents to EMC, Plaintiffs requested "[a]ny and all documents and reports relating to compliance with governmental standards for the AEVIT system."[53] EMC simply referred Plaintiffs to its installation manual.[54]

As discussed above, EMC conducted no testing to ensure that a Ford Econoline E-150 van and/or the McKinney vehicle actually complied with the FMVSS after installation of the AEVIT system.[55]  However, assuming *in arguendo* a vehicle generally still meets the FMVSS after the AEVIT system is installed, the evidence shows that the McKinney vehicle no longer met the minimum braking requirements as prescribed by FMVSS 105.

In his report, Mr. McCracken discusses the minimum braking requirements under FMVSS 105, which necessitate that a vehicle have a deceleration rate of 0.5g to meet this performance standard.[56] Unmodified Ford Econoline E-150 vans normally possess a deceleration rate in excess of 0.7g.[57] However, analysis of the Bosch data and the data downloaded from the AEVIT system shows that the McKinney vehicle was only decelerating at a rate of 0.2g in the seconds before the vehicle collided with the tree, despite near maximum braking being requested.[58] This evidence, as more fully discussed in Plaintiffs' oppositions to Defendants motions in limine to exclude Mr. McCracken's expert opinions, clearly shows that the McKinney vehicle did not meet the minimum braking requirements as set forth in FMVSS 105 at the time of the collision.[59] Because maintenance records show that the McKinney vehicle's brakes were inspected before the collision

---

[52] *Id.*
[53] Exhibit 8, Plaintiffs' Request for Production, at 9.
[54] Exhibit 7, EMC's Discovery Responses, at 28.
[55] Exhibit 1, Nuza Dep., 192:22–195:23.
[56] R. Doc. 40-8, Expert Report of Wayne McCracken, at 6.
[57] *Id.*
[58] R. Doc. 40-8, Expert Report of Wayne McCracken, at 4–6; *see also* Exhibit 1, Nuza Dep., at 226 ("a little more than 75 percent").
[59] R. Doc. 40-8, Expert Report of Wayne McCracken, at 6.

and found to be in good condition, the conclusion reasonably can be drawn by a jury that the AEVIT system manufactured by EMC inhibited the braking of the McKinney vehicle, causing the collision.[60]  Had the McKinney vehicle met the minimum braking requirements of FMVSS 105 at the time of the collision, the McKinney vehicle would have stopped at least eighty (80) feet short of hitting the tree, thus avoiding Mr. McKinney's severe injuries.[61]

Because EMC failed to conduct any kind of testing regarding the McKinney vehicle's braking capabilities after installation of the AEVIT system and further failed to instruct its certified dealer, Superior, to conduct such testing, which would have easily identified the McKinney vehicle's deficient deceleration rate, a reasonable trier of fact could find EMC liable for the defective construction and/or composition of the AEVIT system in the McKinney vehicle. At the very least, this evidence establishes a genuine issue of material fact as to the defective construction and/or composition of the AEVIT system, precluding summary judgment.

**D. Summary judgment is inappropriate because genuine issues of material fact remain as to whether the addition of the aluminum bar and installation of the gas/brake system was a separate, independent, and superseding cause of the collision.**

As EMC states in its memorandum in support, an aluminum extension bar was added to the top of the gas/brake lever during the installation process.[62] During his deposition as Superior's corporate representative, Mr. Angelloz testified that the aluminum bar extension was added to extend the orthotic for the gas/brake farther back, so Mr. McKinney could better reach it.[63] While Mr. McCracken was critical of this aluminum bar in both his report and deposition testimony, this was not the sole defect identified in the AEVIT system installed in the McKinney vehicle, and thus

---

[60] *Id.*
[61] *Id.*
[62] R. Doc. 40-1 at 19.
[63] Exhibit 3, Angelloz Dep., at 303:1–7.

the addition of the aluminum bar cannot absolve EMC of liability for independent defects in the product it manufactured or for its negligence in fulfilling maintenance duties it chose to undertake.

In *Mazant v. Visioneering Inc.*, 250 F. App'x 60, 62 (5th Cir. 2007), the Fifth Circuit was asked to review a jury verdict finding both defendants liable for failing to perform point-load testing on scaffolding that later collapsed and injured the plaintiff. Visioneering, Inc. ("Visioneering") was hired by Lockheed Martin Manned Space Systems ("Lockheed") to design and manufacture scaffolding in accordance with the statement of work provided by Lockheed. *Id.* at 61. When the scaffolding on which the plaintiff was standing collapsed, he brought a products liability claim against Visioneering, alleging that the scaffolding was defective in design. *Id.* at 61–62. To prove the scaffolding's defective design, the plaintiff introduced evidence of Visioneering's failure to conduct point-load testing, which would have revealed the unstable nature of the scaffolding. *Id.* at 62. Visioneering countered that Lockheed's failure to conduct such testing was an intervening and superseding cause of the plaintiff's injuries. *Id.*

At trial, the jury found that the scaffolding was unreasonably dangerous by design as a result of the failure to conduct the point-load testing. *Id.* at 63. The jury further found that the failure to conduct point-load testing was a superseding or intervening cause of the plaintiff's injuries, holding Visioneering thirty percent at fault and Lockheed seventy percent at fault as both failed to perform such testing. *Id.* Visioneering appealed, asking the Fifth Circuit to reconcile the jury's allegedly inconsistent verdict. *Id.*

The Fifth Circuit recognized that, under the superseding cause doctrine, "a tortfeasor is not liable for damages brought about by a later, separate, independent, intervening cause, even though the tortfeasor's conduct may have created the original peril." *Id.* at 66 (citing *Ford v. Pennzoil*, 974 F. Supp. 559, 566 (E.D. La. 1997), *aff'd*, 200 F.3d 816 (5th Cir. 1999)). The court reasoned

that "a manufacturer of an unreasonably dangerous product will be relieved of liability only if an intervening cause superseded the original negligence and *alone* produced the injury." *Id.* (emphasis in original) (citations omitted). The Fifth Circuit ultimately affirmed the jury's verdict, reasoning that the jury was free to find Lockheed's failure to conduct point-load testing to be an intervening cause without necessarily finding such failure superseded the failure of Visioneering to conduct similar testing. *Id.* at 64–65.

Here, Mr. McCracken found the addition of the aluminum bar to be a contributing factor in causing the collision,[64] but not the *only* factor. As discussed extensively above, and similar to the *Mazant* case, the failure on behalf of both EMC and Superior to test the braking capabilities of Ford Econoline E-150 vans and the McKinney vehicle after installation of the AEVIT system also contributed to causing the collision. Had the braking capabilities of the McKinney vehicle been in compliance with FMVSS 105, then the vehicle would have stopped long before colliding with the tree. Such braking deficiencies could have easily been detected had EMC or Superior conducted any kind of testing.[65]

Based on the evidence in the record, a reasonable jury could conclude that the addition of the aluminum bar to the gas/brake lever was not a "separate, independent, intervening cause" that alone produced Mr. McKinney's injuries and superseded EMC's failure to test the braking capabilities of the McKinney vehicle. Therefore, the Court should not dispense with such an issue on summary judgment and, instead, defer resolution to the jury at the trial of this matter.

**E. Summary judgment is inappropriate because genuine issues of material fact remain as to the confusing and inadequate instructions in the EMC installation manual.**

Mr. McCracken testified that EMC's design of the installation manual for the AEVIT

---

[64] Exhibit 2, McCracken Dep., at 276:7–25.
[65] *See* § II.B., *supra*.

system was inadequate and should have included testing of the vehicle's braking capability, particularly because of the "critical nature" of the installation of components that operate safety critical systems of the van (i.e., braking and steering).[66] In preparation for his deposition, Mr. McCracken noticed the improper installation of the brake servomotor and roller, due to an inconsistent wear pattern as evidenced by photographs.[67] This was not a "new" opinion; rather, it simply reinforced and provided another reason why the braking capability of the van was insufficient and defective.[68] He offered alternative designs of the installation directions in his testimony and emphasized the need for testing.[69]

Mr. McCracken explained that an instruction in EMC's installation manual to use a clockface estimate when installing the gas/brake system in the footwell of a vehicle is inadequate because it lacks precision.[70] EMC had knowledge that its "certified dealers" would be installing its system, and EMC apparently takes the initiative to test vehicles when it performs the installation in-house; however, when its third-party certified dealers perform the installation, these dealers are supposed to eyeball a clockface for installation and are not instructed to test the vehicle to ensure the critical nature of the installation was successful. Mr. McCracken discussed how the misalignment of the roller in the McKinney vehicle, as evidenced by the photographs, its contrast with the installation manual's specifications, and the wear pattern on the plastic roller, provides further support for why the braking capability of the vehicle was insufficient.[71] He further testified that the instructions in the installation manual as designed by EMC were inadequate.[72] EMC challenges the reliability of Mr. McCracken's opinions as to its installation manual and the

---

[66] Exhibit 2, McCracken Dep., at 64-66, 23–40.
[67] Exhibit 2, McCracken Dep., at 59–62, 370–79.
[68] Exhibit 2, McCracken Dep., at 70.
[69] *Id.*
[70] *Id.*
[71] Exhibit 2, McCracken Dep., at 60–61.
[72] Exhibit 2, McCracken Dep., at 62–67.

installation of the AEVIT system in the McKinney vehicle.[73] As previously stated, EMC has also filed a motion in limine to exclude Mr. McCracken's testimony, raising similar issues,[74] and Plaintiffs' opposition to that motion more thoroughly addresses Mr. McCracken's qualifications as an expert and his methodology.[75]

EMC claims that it cannot be held liable, even if its installation manual left room for error by its certified EMC dealer when installing its products.[76] In making this argument, EMC relies almost exclusively on the Fifth Circuit's decision in *Pickett v. RTS Helicopter*, 128 F.3d 925 (5th Cir. 1997). However, unlike EMC, the defendant in *Pickett* issued two written warnings "that clearly described the problem, the potential danger, and the solution with easy to understand diagrams." *Id.* at 928. The Fifth Circuit noted that "[t]here is no dispute that the warnings would have been effective to avoid the incorrect configuration of the take-up bar in the hands of someone performing a reassembly of the seat belt." *Id.* Here, the installation manual of the AEVIT system was anything but clear or easy to understand, rendering the *Pickett* case distinguishable.

In regard to EMC's argument that Superior's installation of the AEVIT system, and the mishandling thereof, was an intervening cause of the collision to absolve EMC of liability, Plaintiff again refers to the Fifth Circuit's decision in *Mazant*, holding that an intervening cause is not necessarily a superseding cause. *Mazant*, 250 F. App'x at 65. As stated above, genuine issues of material fact remain as to whether Superior's installation of the AEVIT system in the McKinney vehicle constituted a superseding cause of the collision to clear EMC of liability. Therefore, the Court should deny EMC's motion for summary judgment on this issue.

---

[73] R. Doc. 40-1 at 15–16.
[74] *See* R. Doc. 44.
[75] *See* R. Doc. 56.
[76] R. Doc. 40-1 at 21–22.

**F. Summary judgment is inappropriate because genuine issues of material fact remain as to Plaintiffs' negligence claims against EMC.**

EMC has filed a separate motion for summary judgement regarding Plaintiffs' non-LPLA claims against EMC.[77] In opposition to that motion, Plaintiffs provide ample support for the proposition that the LPLA does not necessarily preclude separate negligence claims, where a manufacturer undertakes duties that are distinct from its manufacturing role. Plaintiffs' claims against EMC include a failure to properly maintain the McKinney vehicle in its role as a maintenance provider, separate and apart from its role as a manufacturer. As explored more fully in Plaintiffs' opposition to EMC's other motion for summary judgment, genuine issues of fact remain as to whether EMC negligently maintained the McKinney vehicle and whether EMC's negligent performance as a maintenance provider was a contributing factor to the collision.[78]

This issue is not properly before the Court under this motion, as EMC has filed a separate motion for summary judgment addressing the same claims. However, for these reasons, as well as those more completely set forth in Plaintiffs' Memorandum in Opposition to Electronic Mobility Controls, L.L.C.'s Motion for Summary Judgment as to the Plaintiffs' Claims Other Than Those Set Forth in the Louisiana Product Liability Act, and Those Set Forth in the Redhibition Articles of the Louisiana Civil Code, Plaintiffs' respectfully submit that the Court deny EMC's motion on this issue.

**III.   CONCLUSION**

Accordingly, because Plaintiffs have set forth ample evidence of genuine issues of material fact precluding summary judgment, Electronic Mobility Controls, L.L.C.'s Motion for Summary Judgment as to the Plaintiffs' Product Defect Claims and Lack of Causation must be denied.

---

[77] *See* R. Doc. 43.
[78] *See* R. Doc. 55.

Respectfully submitted,

**GAINSBURGH, BENJAMIN, DAVID,
MEUNIER & WARSHAUER, L.L.C.**

BY: _/s/ M. Palmer Lambert_
      **M. PALMER LAMBERT**
      **BAR NO. 33228**
      **RACHEL M. NAQUIN**
      **BAR NO. 37816**
      2800 Energy Centre
      1100 Poydras Street
      New Orleans, Louisiana 70163-2800
      Telephone: (504) 522-2304
      Facsimile:  (504) 528-9973
      E-mail:  plambert@gainsben.com
      E-mail:  rnaquin@gainsben.com

      _- and -_

      _/s/ Sonja C. Bradley_
      **SONJA C. BRADLEY**
      **BAR NO. 27400**
      Post Office Box 727
      20165 Iowa Street
      Livingston, LA 70754
      Telephone: (225) 686-8006
      E-Mail:  sonjabradley@att.net

      _Attorneys for Plaintiffs, Robin McKinney and
      Jeffrey McKinney_

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a copy of the above and foregoing Pleading was this day

forwarded to all counsel of record by depositing a copy of same via:

| | United States Mail | | Certified Mail |
|---|---|---|---|
| ☐ | United States Mail | ☐ | Certified Mail |
| ☐ | Facsimile | ☐ | Hand Delivery |
| ☐ | Email | ☐ | Overnight Mail |
| ☒ | ECF System | | |

THIS the 1st day of January, 2021.

*/s/ M. Palmer Lambert*
**M. PALMER LAMBERT**