## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

**ROBIN MCKINNEY, ET AL.**                              CIVIL ACTION

**VERSUS**                                              No. 20-1169

**SUPERIOR VAN & MOBILITY,**                            SECTION I
**LLC, ET AL.**

### ORDER & REASONS

This case arose out of a single-vehicle accident in Tangipahoa Parish.  Bryce McKinney ("Bryce") was injured after his van, which was equipped with defendant Electronic Mobility Control's ("EMC") steering, braking, and throttle controls,[1] veered off the road and struck a tree.  Acting on Bryce's behalf,[2] Bryce's parents, Robin and Jeffery McKinney (the "McKinneys"), sued EMC and Superior Van and Mobility ("Superior"), which installed the controls in the van.[3]

Now before the Court are three motions *in limine* and two motions for summary judgment.  Two of the motions *in limine* (filed separately by EMC and Superior) seek to exclude the testimony of the McKinneys' expert, L. Wayne McCracken, Jr., PE ("McCracken"),[4] and the third (filed by EMC) seeks to exclude any evidence or testimony of other past accidents or lawsuits involving EMC products.[5]  The McKinneys oppose all three motions,[6] to which neither EMC nor

---

[1] R. Doc. No. 43-2, at 1 ¶ 1.
[2] Bryce executed a power of attorney, which granted his parents the authority to assert and litigate claims on his behalf.  R. Doc. No. 1-2, at 2 ¶ 4.
[3] R. Doc. No. 1-2, at 2 ¶ 9.
[4] R. Doc. Nos. 37, 44.
[5] R. Doc. No. 48.
[6] R. Doc. Nos. 54, 56, 57.

Superior replied.  The motions for summary judgment argue that there is no genuine issue of material fact as to either the McKinneys' product defect claims or legal causation and that the defendants are entitled to judgment as a matter of law.[7]  The McKinneys opposed both;[8] only EMC filed a reply (Superior did not).[9]

For the reasons that follow, the two motions *in limine* as to McCracken's expert testimony are denied, the motion *in limine* as to EMC's past accidents and lawsuits is dismissed without prejudice, and both motions for summary judgment are denied.

## I.    BACKGROUND

In 2007, Bryce was partially paralyzed while playing football.[10]  He received a "cervical fusion," which left him with limited mobility in his "upper extremities."[11]  In 2014, Bryce and his father purchased a van from Superior, in which Superior had installed computerized mobility controls that would enable Bryce to operate the van himself, using his hands.[12]  Those mobility controls, called the Advanced Electronic Vehicle Interface Technology ("AEVIT") controls, were designed and manufactured by EMC.[13]

The McKinneys allege that the AEVIT controls malfunctioned while Bryce was driving the van (which was towing a utility trailer) in October 2019; that malfunction

---

[7] R. Doc. Nos. 40, 45.

[8] R. Doc. Nos. 58, 59.

[9] R. Doc. No. 65.

[10] R. Doc. No. 43-4, at 2.  These background facts were adapted from the Court's April 2, 2021 order and reasons, which granted summary judgment for EMC as to the McKinneys' non-LPLA claims.  *See* R. Doc. No. 80.

[11] R. Doc. No. 43-4, at 2.

[12] R. Doc. No. 1-2, at 3 ¶ 9.

[13] R. Doc. No. 43-2, at 1 ¶ 1.

caused the van to drift right across a lane of traffic, leave the road, and travel "approximately 100 feet before striking a tree with its front bumper."[14]

The McKinneys brought negligence and products liability claims against both EMC and Superior.  This Court subsequently granted EMC's motion for summary judgment as to the general negligence claim asserted against EMC, holding that the Louisiana Products Liability Act's ("LPLA") exclusivity provision bars a negligence claim against a manufacturer for damage caused by its product.[15]  The McKinneys have also stipulated that they do not pursue various claims: (1) as to EMC, they are no longer pursuing LPLA-based claims for failure to warn, breach of express warranty, or redhibition;[16] and (2) as to Superior, they are no longer pursuing a redhibition claim, but they "maintain all other claims."[17]

The McKinneys advance several theories as to the AEVIT system's defectiveness: (1) neither EMC nor Superior conducted sufficient testing on the AEVIT system once it was installed in Bryce's van, which meant that they had no way to "determine what would happen in the event of a complete system failure or to design safeguards against such a scenario," rendering the system defective in design;[18] (2) the "roller connected to the servomotor that compressed the brake pedal"

---

[14] R. Doc. No. 1-2, at 4 ¶¶ 14, 16.  At some point "after June" in 2019, Bryce had a similar malfunction while turning onto a road from a stop, which resulted in no injuries.  R. Doc. No. 55-3, at 2.

[15] *See generally* R. Doc. No. 80.  Superior did not join in that motion, and the Court expresses no opinion as to that issue here.

[16] R. Doc. No. 58, at 2 n.1.

[17] R. Doc. No. 59, at 2 n.4.

[18] R. Doc. No. 58, at 3.

in the van "was made out of plastic, as opposed to a sturdier material;"[19] (3) the roller "was installed in such a way that caused the roller to wear away over time;"[20] (4) the roller's "misalignment" with the brake pedal "can be attributed to the confusing and inadequate instructions in EMC's installation manual that instruct the installer to align components of the braking system by eyeballing the angles of a clock face without giving any frame of reference in the footwell of the vehicle;"[21] and (5) Superior's installing of an aluminum extension bar onto the "gas/brake controller . . . could [have] impact[ed] the ability to control the gas/brake in the" van.[22]

The plaintiffs retained McCracken as their liability expert, who formed opinions supporting those five theories of defectiveness (and testified thereto at his deposition). The defendants now challenge his qualifications and testimony under Federal Rule of Evidence 702 and *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 588 (1993), seeking to bar his testimony in full. EMC also seeks to exclude evidence relating to similar prior accidents and lawsuits involving the AEVIT system. The Court addresses the motions *in limine* first, then turns to EMC's and Superior's separate motions for summary judgment.

---

[19] *Id.*
[20] *Id.*
[21] *Id.*
[22] R. Doc. No. 59, at 10.

4

## II.   MOTIONS *IN LIMINE*

Federal Rule of Evidence 702 governs the admissibility of expert witness testimony. *See Daubert*, 509 U.S. at 588; *United States v. Hitt*, 473 F.3d 146, 148 (5th Cir. 2006). Rule 702 provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
> (b) the testimony is based on sufficient facts or data;
> (c) the testimony is the product of reliable principles and methods; and
> (d) the expert has reliably applied the principles and methods to the facts of the case.

"To qualify as an expert, 'the witness must have such knowledge or experience in [his] field or calling as to make it appear that his opinion or inference will probably aid the trier in his search for truth.'" *United States v. Hicks*, 389 F.3d 514, 524 (5th Cir. 2004) (quoting *United States v. Bourgeois*, 950 F.2d 980, 987 (5th Cir. 1992)). Additionally, Rule 702 states that an expert may be qualified based on "knowledge, skill, experience, training, or education." *Id.*; *see also Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 147 (1999) (discussing witnesses whose expertise is based purely on experience).

"A district court should refuse to allow an expert witness to testify if it finds that the witness is not qualified to testify in a particular field or on a given subject." *Huss v. Gayden*, 571 F.3d 442, 452 (5th Cir. 2009) (quoting *Wilson v. Woods*, 163 F.3d 935, 937 (5th Cir. 1999)). However, "Rule 702 does not mandate that an expert be

highly qualified in order to testify about a given issue. Differences in expertise bear chiefly on the weight to be assigned to the testimony by the trier of fact, not its admissibility." *Id.*; *see Daubert*, 509 U.S. at 596.

*Daubert* "provides the analytical framework for determining whether expert testimony is admissible under Rule 702." *Pipitone v. Biomatrix, Inc.*, 288 F.3d 239, 243 (5th Cir. 2002). Both scientific and nonscientific expert testimony is subject to the *Daubert* framework, which requires a trial court to make a preliminary assessment to "determine whether the expert testimony is both reliable and relevant." *Burleson v. Tex. Dep't of Criminal Justice*, 393 F.3d 577, 584 (5th Cir. 2004); *see Kumho Tire*, 526 U.S. at 147.

A number of nonexclusive factors may be considered in the reliability inquiry, including: (1) whether the technique has been tested, (2) whether the technique has been subjected to peer review and publication, (3) the technique's potential error rate, (4) the existence and maintenance of standards controlling the technique's operation, and (5) whether the technique is generally accepted in the relevant scientific community. *Burleson*, 393 F.3d at 584. The reliability inquiry must remain flexible, however, as "not every *Daubert* factor will be applicable in every situation; and a court has discretion to consider other factors it deems relevant." *Guy v. Crown Equip. Corp.*, 394 F.3d 320, 325 (5th Cir. 2004); *see Runnels v. Tex. Children's Hosp. Select Plan*, 167 F. App'x 377, 381 (5th Cir. 2006) ("[A] trial judge has 'considerable leeway' in determining 'how to test an expert's reliability.'" (quoting *Kumho Tire*, 526 U.S. at 152)). "Both the determination of reliability itself and the factors taken into account

6

are left to the discretion of the district court consistent with its gatekeeping function under [Rule] 702." *Munoz v. Orr*, 200 F.3d 291, 301 (5th Cir. 2000).

As for determining relevancy, the proposed testimony must be relevant "not simply in the way all testimony must be relevant [under Rules 401 and 402], but also in the sense that the expert's proposed opinion would assist the trier of fact to understand or determine a fact in issue." *Bocanegra v. Vicmar Servs., Inc.*, 320 F.3d 581, 584 (5th Cir. 2003). "There is no more certain test for determining when experts may be used than the common sense inquiry whether the untrained layman would be qualified to determine intelligently and to the best degree the particular issue without enlightenment from those having a specialized understanding of the subject involved in the dispute." *Vogler v. Blackmore*, 352 F.3d 150, 156 n.5 (5th Cir. 2003) (quoting Fed. R. Evid. 702 advisory committee's note).

The Court applies a preponderance of the evidence standard when performing its gatekeeping function under *Daubert*. *See Daubert*, 509 U.S. at 592 n.10. And the Court is not bound by the rules of evidence—except for those concerning privileges—when doing so. *See id.*

EMC and Superior have both challenged McCracken's testimony. They (together, except where noted otherwise) challenge McCracken's (1) expert qualifications, (2) opinion that the equipment was improperly installed, and (3) technical bases and calculations for his reconstruction of the events leading up to Bryce's collision with the tree. The Court rejects all three arguments.

### A.

EMC and Superior first challenge McCracken's qualifications.  They argue that he has no experience with design or operation of vehicles with drive-by-wire control systems like the McKinneys' van.[23]  They further argue that he has no experience in preparing installation manuals and has never been qualified by any state or federal court to testify as to the adequacy or sufficiency of an installation manual.[24]

The McKinneys respond persuasively in McCracken's defense.  As to his general qualifications, they note that McCracken has a B.S. in electrical engineering from Duke University, which included "a specialty in fault detection and diagnosis in digital systems."[25]  He is certified in accident reconstruction by the Society of Automotive Engineers, and he has worked in "accident reconstruction and consulting engineering" for over thirty years.[26]  And, while recognizing that McCracken has not examined a vehicle with as "admittedly unique" a modification as this, the McKinneys further argue that "the accident reconstruction and engineering principles that form the foundation of his opinions do not require specific experience with hand control vehicles."[27]

Rule 702 does not require an expert to have perfect credentials.  *See Bell v. Foster Wheeler Energy Corp.*, No. 15-6394, 2016 WL 5847124, at *2 (E.D. La. 2016) (Africk, J.).   Accordingly,   courts   "have   eschewed   imposing   overly   rigorous

---

[23] R. Doc. No. 44-1, at 19.
[24] *Id.*
[25] R. Doc. No. 56, at 7.
[26] *Id.* at 8.
[27] *Id.* at 9–10.

requirements of expertise and have been satisfied with more generalized qualifications." *In re Paoli R.R. Yard PCB Litig.*, 35 F.3d 717, 741 (3d Cir. 1994). Therefore, "if the witness has qualifications in the general field related to the subject matter in question," then "the witness need not have specialized expertise in the area directly pertinent to the issue in question." *Guzman v. Memorial Hermann Hosp. Sys.*, No. 07-3973, 2008 WL 5273713, at *15 (S.D. Tex. 2008).

McCracken is qualified under Rule 702. Aside from his extensive general experience as an engineer and expert in accident reconstruction—which numerous state and federal courts have accepted[28]—he also has significant experience relevant to this case. For example, he testified that he has "looked at installation manuals for years [regarding] many, many different things,"[29] and during one stint in his career, he "ran the service department" for a motorcycle dealership, a role in which he regularly "gave feedback" to manufacturers on mistakes that he spotted in their installation manuals.[30] That provides him with some practical experience by which

---

[28] The McKinneys cite a number of courts that have accepted McCracken's testimony. *See, e.g.*, *Cruz v. Kumho Tire Co.*, No. 10-219, 2015 WL 2193796, at *13 (N.D.N.Y. May 11, 2015) (regarding vehicle fire reconstruction); *Henderson v. Goodyear Dunlop Tires N. Am., Ltd.*, No. 11-295, 2013 WL 5729377, at *6 (M.D. Ala. Oct. 22, 2013) (regarding motorcycle stability); *Harris v. City Cycle Sales, Inc.*, 455 P.3d 825 (Kan. Ct. App. 2020) (regarding braking and ABS issues, among others); *Pitterman v. Gen. Motors LLC*, No. 14-00967, 2018 WL 7118006, at *23 (D. Conn. Apr. 18, 2018), *vacated on other grounds* (Jan. 16, 2019) (regarding transmission locking mechanism); *Ray v. Ford Motor Co.*, 792 F. Supp. 2d 1274, 1278 (M.D. Ala. 2011) (regarding gearshift interlock); *Jimenez v. Chrysler Corp.*, 74 F. Supp. 2d 548, 569 (D.S.C. 1999) (regarding vehicle latch design in conjunction with crash and causation issues), *rev'd in part on other grounds sub nom. Jimenez v. DaimlerChrysler Corp.*, 269 F.3d 439 (4th Cir. 2001).

[29] R. Doc. No. 56-7, at 178.

[30] *Id.* at 179.

he may assess the adequacy of EMC's installation manual—experience that might well aid the jury.

More importantly, he is also familiar with anti-lock braking systems and the Bosch Crash Data Retrieval ("Bosh CDR") system—the system that recorded the van's input and output data prior to the crash.[31]   That familiarity has assisted McCracken in forming his deficient-braking opinions, and it may assist the jury in determining what happened in the moments immediately before the collision.

### B.

Next, EMC (but not Superior) challenges McCracken's deposition testimony that the EMC equipment was improperly installed due to inadequate instructions[32] in EMC's installation manual.  EMC makes two arguments: (1) it is a "new" opinion not disclosed in his expert report; and (2) because he has not examined the van physically in person—either since the accident or immediately after the EMC equipment was installed—"McCracken cannot now speculate as to whether the install [sic] was done properly or not.  Accordingly, any claim as to improper installation and, in turn installation instructions is without a [sic] supporting

---

[31] R. Doc. No. 56, at 8.

[32] R. Doc. No. 58-2, at 40–41 (McCracken's deposition, describing the installation manual, which requires AEVIT installers to visualize a clockface diagram in the footwell of the vehicle when installing the gas/brake servomotor); *id.* at 70 ("You're asking somebody to eyeball, literally eyeball 7:30 to 8:30 [on an imaginary clockface] underneath a console somehow, and I just don't think for this kind of installation that's accurate."); *id.* ("I mean, at least you could have told the technician, you know, you need to hang some kind of a plumb bob down [as a vertical reference point].").

evidence or a foundation and should be dismissed.  Any such testimony is speculative and unreliable."[33]  The Court rejects both arguments.

First, the Court finds McCracken's observations about the installation manual, set forth above, to be merely elaborations on the opinion timely disclosed in his expert report.  That report stated:

> Both the EMC and Bosch data show that for at least the last 5 or more seconds Mr. McKinney is applying maximum or near maximum braking through the left hand control on the EMC/Superior system.  The Bosch data shows that ABS braking was initiated at 3 seconds before impact.  ABS engagement should occur only under maximum braking conditions.  Bosch data also shows maximum or near maximum braking being requested for 5 seconds before impact.[34]

Therefore, as recounted in his report, the data shows a two-second lag between when "maximum or near maximum braking" was requested through the EMC hand-controls, and when the EMC equipment actually applied maximum force to the brake pedal.  McCracken concluded and summarized in his report that "[i]t is therefore clear that the EMC/Superior system installed in this van at the time of the accident is inhibiting Mr. McKinney from stopping his vehicle."[35]

Then, after reviewing the photos of the EMC equipment in preparation for his deposition, McCracken concluded that "the brake system . . . was not properly installed in the vehicle by Superior."[36]  He concluded as much by noticing both "a wear pattern on the roller that indicates it was improperly installed" and "a huge

---

[33] R. Doc. No. 44-1, at 20.
[34] R. Doc. No. 44-9, at 100.
[35] *Id.*
[36] *Id.* at 30.

11

amount of clearance between the roller and the extension bracket."[37]   He testified that "[n]either one of those should have existed, and I think they both have contributed to the lack of proper braking that we can see from the instrumented data" on which his report was based.[38]

These are not "new opinions," as EMC suggests; they are simply explanations for the opinion originally stated in McCracken's original report—that the EMC system "inhibit[ed] Mr. McKinney from stopping his vehicle."[39]   Because these statements simply elaborate on the timely expert opinion, they are not excludable as untimely new opinions. *See, e.g.*, *Rodgers v. Gusman*, No. 16-16303, 2019 WL 3220107, at *6 (E.D. La. July 17, 2019) (Brown, C.J.) (finding an opinion was not new because it "only clarifie[d] the opinions set forth in the expert report"); *Nagle v. Saia Motor Freight Line, Inc.*, No. 02-1849, 2003 WL 25665774, at *1 (E.D. La. June 19, 2003) (Engelhardt, J.) (finding that the expert's supplemental report merely "elaborate[d] on the opinions stated in the original report").

Moreover, assuming *arguendo* that these were new opinions, the Court finds good cause to allow McCracken to testify to them.   *See Loza v. Select Portfolio Servicing, Inc.*, 820 F. App'x 240, 242 (5th Cir. 2020) (reciting four-factor test for good cause: explanation for the delay/modification, importance of the modification, potential prejudice, and whether that prejudice is curable).   The reason for the delay here is admittedly unconvincing—McCracken explained that he simply "had not

---

[37] *Id.* at 31.
[38] *Id.*
[39] *Id.* at 100.

12

properly appreciated" the photographs when he originally examined them for his report.[40]  That said, this testimony is highly important to the McKinneys' case—and it is backed up by the data.[41]  Moreover, little (if any) prejudice to the defendants results from its admission.  McCracken was deposed on December 16, 2020—six months before the current trial date.  That has given EMC plenty of time to develop contrary testimony, lessening whatever prejudice it might suffer.  Indeed, EMC spent over nine hours deposing McCracken—including a lengthy discussion of his supposedly new opinion.[42]  Therefore, to the extent EMC is faced with a new expert opinion, it has had more than a sufficient opportunity to challenge the opinion, which minimizes its prejudicial effect.

Second, EMC challenges McCracken's opinion that the EMC equipment was improperly installed because such opinion is "speculative and unreliable."[43]  EMC appears to base its argument on the fact that McCracken has not personally observed the equipment; instead, EMC claims, his opinion is "based on a few post collision photographs he reviewed with plaintiff [sic] counsel the night before his deposition."[44]  (Separately, but relatedly, both EMC and Superior generally challenge McCracken's opinion because he has not inspected the scene of the collision in person.[45])

---

[40] R. Doc. No. 56-7, at 29.
[41] McCracken explained that he was examining the photos again in part because "we had the data that showed it, that the braking was not proper."  *Id.*
[42] R. Doc. No. 56, at 13.
[43] R. Doc. No. 44-1, at 20.
[44] *Id.* at 20.
[45] *Id.* at 20–21; R. Doc. No. 37-1, at 19.

The McKinneys respond that that characterization distorts reality—they note that McCracken reviewed "thousands of pages of materials" to inform his opinions for this case, "including materials excluded from EMC's" summary of the materials McCracken relied upon.[46]  And they explain that "[n]ot only was there no physical evidence remaining to inspect by the time Mr. McCracken was retained in this litigation, but also there was adequate photographic and video (police body and dash camera footage) evidence available."[47]  Moreover, they point to the testimony of EMC's and Superior's experts to bolster McCracken's method for concluding that the equipment was misaligned—all experts agree that the uneven wear pattern in the plastic brake roller indicates persistent misalignment (since the wear pattern cannot develop overnight).[48]  And those experts agree that, if a roller is misaligned as McCracken suggests, that misalignment can alter the brakes' responsiveness.[49]

The Court is persuaded by the McKinneys.  EMC is wrong to claim that McCracken's opinion is "speculative."  An opinion is speculative if it is "mere *ipse dixit*" or if supported only by a "because [I] said so" explanation.  *See Henderson v. McMoran Oil & Gas, LLC*, No. 09-5626, 2011 WL 13377430, at *4 (E.D. La. Mar. 2, 2011) (Africk, J.) (citing *Metavante Corp. v. Emigrant Sav. Bank*, 619 F.3d 748, 761 (7th Cir. 2010)).  McCracken has provided more than that here.  To arrive at his

---

[46] R. Doc. No. 56, at 8–9.
[47] *Id.* at 15.
[48] R. Doc. No. 75-1, at 18 (deposition of A.J. McPhate, testifying that "[t]he wear pattern is consistent with the apparent misalignment"); R. Doc. No. 75-2, at 5 (deposition of Gary R. Rogers, agreeing that there is "an uneven wear pattern").
[49] R. Doc. No. 75-1, at 90–91; R. Doc. No. 75-2, at 110.

conclusion that the equipment was improperly installed, he pointed to an objective, observable characteristic: that the wear pattern on the EMC brake roller is uneven, which he says (and the opposing experts agree) suggests misalignment over a significant period of time. Therefore, to the extent McCracken's opinion is that the brake roller was misaligned, and this misalignment was present for a significant period of time prior to the accident, it is admissible. EMC's argument goes to the weight, as opposed to the admissibility, of such testimony.

## C.

Finally, EMC and Superior challenge McCracken's basis for his reconstruction of the accident and his ultimate conclusion that, but for the braking failure, the van would have stopped (either on the paved shoulder or in the grass) prior to striking the tree. They claim that he has engaged in "impermissible data 'cherry picking'" to formulate that opinion.[50] Their argument is hard to follow, but they claim that McCracken has focused on only "2 or 3 data points of the entire set of data points from the ECM [sic] Bosch download," which he "cherry-picked to scientifically apply a 0.4 coefficient of friction to the entire 100 feet of ground surface over which the McKinney van traveled from the pavement of the interstate to colliding with the tree."[51] This appears to be a reference to McCracken's calculation of the roadside

---

[50] R. Doc. No. 44-1, at 21 (quoting *In re Fluidmaster, Inc., Water Connector Components Prods. Liab. Litig.*, MDL No. 2575, 2017 WL 1196990, at *21 (N.D. Ill. Mar. 31, 2017)); R. Doc. No. 37-1, at 20.
[51] R. Doc. No. 44-1, at 21; R. Doc. No. 37-1, at 19.

grass's friction coefficient—the figure used to determine how long it should have taken the van to stop once full braking was applied.

The McKinneys argue that Superior's and EMC's objection is a red herring—because most of the van's braking "(3.8 out of 6.8 seconds) . . . occurred on the roadway surface," and McCracken's ultimate conclusion is that, if the brakes were working properly, the van would have required "twenty (20) feet or less of braking on the wet grass."[52] Accordingly, the friction of the grass does not matter much.  On the merits, they argue that McCracken had good reasons to use the data that he used—pointing to the portions of his deposition in which he defended his methodology and the reliability of his data.[53]  They conclude that this issue should be left for the jury.

The Court agrees.   The defendants' objection goes more to McCracken's credibility than his reliability.  "As a general rule, questions relating to the bases and sources of an expert's opinion affect the weight to be assigned that opinion rather than its admissibility and should be left for the jury's consideration."  *United States v. Hodge*, 933 F.3d 468, 478 (5th Cir. 2019) (quoting *United States v. 14.38 Acres of Land, More or Less Situated in Leflore Cty., State of Miss.*, 80 F.3d 1074, 1077 (5th

---

[52] R. Doc. No. 56, at 16 (citing R. Doc. No. 56-7, at 118).  And Superior's own expert agrees with McCracken's analysis in that, "if the brakes were applied sufficiently, if the demand was there . . . that . . . it should have been able to stop on the *pavement*." R. Doc. No. 75-1, at 14–15 (emphasis added).

[53] For example, McCracken explained that "[l]aw enforcement is using [Bosch data] quite often these days" for accident reconstruction, R. Doc. No. 56-7, at 174, and that "Bosch data has been almost universally accepted as accurate." *Id.* at 173.   In contrast, McCracken testified that he "ha[s]n't seen [the EMC data] before," and he has "no idea whether it's been peer-reviewed or how accurate it's supposed to be."  *Id.* at 173–74.

Cir. 1996)), *cert. denied*, 141 S. Ct. 131 (2020).  Accordingly, the Court will not keep this testimony from the jury.

### D.

The Court now turns to EMC's separate motion *in limine* to exclude "evidence or testimony of other accidents or lawsuits involving EMC."[54]  It argues that the other accidents are irrelevant under Federal Rule of Evidence 401, since most of those incidents involved alleged steering defects, while this one (at least according to EMC) involves only an alleged braking defect.[55]  The McKinneys respond that that "erroneously" mischaracterizes their theory of the case—because they also lodge a variety of other theories as to the van's defectiveness.[56]  They also note that "when the evidence of other accidents is relevant to the issue of notice," the requirement that a prior accident be "substantially similar . . . should be relaxed."[57]

It would be imprudent to categorically exclude evidence not yet before the Court.  The Court will instead dismiss EMC's motion without prejudice to its being re-urged at trial.  At that time, the Court will also be better able to employ the balancing test set forth in Federal Rule of Evidence 403.  This ensures that the Court

---

[54] R. Doc. No. 48, at 1.
[55] R. Doc. No. 48-1, at 2.
[56] R. Doc. No. 54, at 4–5.
[57] *Id.* at 5 (citing *Johnson v. Ford Motor Co.*, 988 F.2d 573, 580 (5th Cir. 1993)).  The Court notes that U.S. Magistrate Judge North granted the McKinneys' motion to compel the production of data logs relating to these similar prior accidents, although that order took no position with respect to the admissibility of such evidence.  R. Doc. No. 64.

has before it the precise context in which this evidence is offered, and the purposes for its offering.

## IV.   SUMMARY JUDGMENT

The Court now turns to Superior's and EMC's separate motions for summary judgment.[58]  It denies both.

Summary judgment is proper when, after reviewing the pleadings, the discovery and disclosure materials on file, and any affidavits, a court determines that there is no genuine dispute of material fact and the movant is entitled to judgment as a matter of law.  Fed. R. Civ. Proc. 56(a).  "[A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  The party seeking summary judgment need not produce evidence negating the existence of a material fact; it need only point out the absence of evidence supporting the other party's case.  *Id.*; *see also Fontenot v. Upjohn Co.*, 780 F.2d 1190, 1195–96 (5th Cir. 1986) ("There is no sound reason why conclusory allegations should suffice to require a trial when there is no evidence to support them even if the movant lacks contrary evidence.").

Once the party seeking summary judgment carries that burden, the nonmoving party must come forward with specific facts showing that there is a genuine dispute of material fact for trial.  *See Matsushita Elec. Indus. v. Zenith Radio*

---

[58] *See* R. Doc. No. 40 (EMC's motion); R. Doc. No. 45 (Superior's motion).

*Corp.*, 475 U.S. 574, 587 (1986).   The showing of a genuine issue is not satisfied by creating "'some metaphysical doubt as to the material facts,' by 'conclusory allegations,' by 'unsubstantiated assertions,' or by only a 'scintilla' of evidence." *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (citations omitted).   Rather, a genuine issue of material fact exists when the "evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

"Although the substance or content of the evidence submitted to support or dispute a fact on summary judgment must be admissible . . . the material may be presented in a form that would not, in itself, be admissible at trial." *Lee v. Offshore Logistical & Transp., L.L.C.*, 859 F.3d 353, 355 (5th Cir. 2017) (citations omitted). The party responding to the motion for summary judgment may not rest upon the pleadings but must identify specific facts that establish a genuine issue.   *See Anderson*, 477 U.S. at 248.   The nonmoving party's evidence, however, "is to be believed, and all justifiable inferences are to be drawn in [the nonmoving party's] favor."   *Id.* at 255.

## A.

Starting with EMC's motion for summary judgment, the Court notes that the McKinneys have "stipulated that [they] will not pursue a failure to warn claim, a breach of express warranty claim, or a redhibition claim against EMC."[59]   The Court

---

[59] R. Doc. No. 58, at 2 n.1; *see also* R. Doc. No. 40-1, at 1–2 n.2 (EMC's motion for summary judgment, noting the same).

also granted EMC's motion for partial summary judgment on the McKinneys' negligence claim as being barred by the Louisiana Products Liability Act's ("LPLA") exclusivity provision.[60]  That leaves the plaintiffs with only design- and manufacturing-defect theories against EMC.  *See* La. Rev. Stat. § 9:2800.54(B).  The Court finds that there are genuine issues of material fact as to each of EMC's arguments concerning these theories.

### 1.    *Design Defect*

First, EMC argues that the "McKinneys have failed to provide any evidence" that the AEVIT system was "unreasonably dangerous in design."[61]  To prove a design defect under the LPLA, a plaintiff must show:

> (1) There existed an alternative design for the product that was capable of preventing the [plaintiff's] damage; and
> (2) The likelihood that the product's design would cause the [plaintiff's] damage and the gravity of that damage outweighed the burden on the manufacturer of adopting such alternative design and the adverse effect, if any, of such alternative design on the utility of the product.

*Johnson v. Teva Pharms. USA, Inc.*, 758 F.3d 605, 612 (5th Cir. 2014) (quoting La. Rev. Stat. § 9:2800.56).

The McKinneys posit several changes that they claim, were EMC to adopt all three as an alternative design to the AEVIT system, could have prevented the collision: "whether a different material could have been used for the roller on the gas/brake servomotor, whether EMC should have required post-installation testing and measurement of safety critical braking capability as part of its installation

---

[60] R. Doc. No. 80.
[61] R. Doc. No. 40-1, at 6.

directions to dealer-installers, and whether EMC failed to adequately test the AEVIT system."[62]  They argue that whether this alternative design could have prevented Bryce's injuries is a disputed question of fact that the jury must decide.  The Court agrees.

McCracken opined that EMC should require its dealers to conduct what he called a failure-modes-and-effects analysis ("FMEA").  Such testing asks "what happens if this breaks, what happens if this fails, [or] what happens if this happens. You go through the whole chain of your design from start to end so that you can identify potential failure modes and then correct them."[63]  His report stated that failing to do such testing after installation of the AEVIT controls is "unconscionable."[64]  And he stated that "[i]f Ford had designed a handicapped driving system for this van, there would have been numerous FMEA's relating to all safety critical systems, which could then be analyzed for fail-safe operation."[65]

According to McCracken, that failure to test, combined with an installation manual that is vague enough to cause inconsistent installations,[66] renders the AEVIT system defectively designed.  That is, because such testing could spot flaws in an

---

[62] R. Doc. No. 58, at 6.

[63] R. Doc. No. 58-2, at 54.

[64] R. Doc. No. 40-8, at 6.

[65] *Id.* at 7.

[66] R. Doc. No. 58-2, at 38; *see also id.* at 40–41 (describing the installation manual, which requires AEVIT installers to visualize a clockface diagram in the footwell of the vehicle when installing the gas/brake servomotor); *id.* at 70 ("You're asking somebody to eyeball, literally eyeball 7:30 to 8:30 [on an imaginary clockface] underneath a console somehow, and I just don't think for this kind of installation that's accurate."); *id.* ("I mean, at least you could have told the technician, you know, you need to hang some kind of a plumb bob down [as a vertical reference point].").

installed AEVIT system—particularly in one incorrectly installed by Superior[67]—EMC's design should require such testing.[68]

And McCracken also testified that EMC, instead of using a plastic roller to control the brake pedal, "could have used a roller bearing, for example, or even a ball bearing perhaps. It would have been a little more expensive, but a lot less chances for any significant wear."[69] As explained above, he reached that conclusion after noticing uneven wear patterns on the plastic roller. Taken together—the failure to test and the condition of the roller—McCracken opined that "[t]here is no doubt in [his] mind" that they "contributed to causing the incident in this case."[70]

Considering the totality of the McKinneys' evidence, and the reasonable inferences that may be drawn therefrom, it is clear that there remain genuine issues of material fact that require a trial. Although a failure-to-test is not alone sufficient to support an independent claim under the LPLA, "the failure to test [may] render[] the product unreasonably dangerous." *MacDonald v. Monsanto*, No. 95-40133, 1995 WL 581942, at *2 n.3 (5th Cir. Sept. 13, 1995); *In re FEMA Trailer Formaldehyde Prod. Liab. Litig.*, No. 07-1873, 2009 WL 2382773, at *3 (E.D. La. July 23, 2009) (Engelhardt, J.). Other than arguing that McCracken's testimony should be barred

---

[67] R. Doc. No. 58-2, at 35–36.

[68] *Id.* at 39–40 ("Well, the defect would be from the instruction standpoint, that it's not properly – the technician that's doing this [installation] isn't properly instructed as to how to do it. . . . [T]here are probably a lot of other ways to do it that would have accomplished the same thing that would have had a lot more precision [than] in what we see in this system.").

[69] *Id.* at 56–57.

[70] *Id.* at 63–64.

(which this Court rejected above),[71] EMC makes no other arguments in favor of granting summary judgment on the McKinneys' design defect claim. Accordingly, the Court will deny EMC's motion for summary judgment as to that claim.

## 2.    *Manufacturing Defect*

Second, EMC argues that the McKinneys "cannot offer adequate evidence to support" their manufacturing defect claim.[72] To prove a manufacturing defect claim under the LPLA, a plaintiff must show that "at the time the product left [the] manufacturer's control, the product deviated in a material way from the manufacturer's specifications or performance standards for the product or from otherwise identical products manufactured by the same manufacturer." La. Rev. Stat. § 9:2800.55. In other words, the plaintiff must show "what a manufacturer's specifications or performance standards are for a particular product" *and* "how the product [used by the plaintiff] materially deviated from those standards so as to render it unreasonably dangerous." *Lyles v. Medtronic Sofamor Danek, USA, Inc.*, 871 F.3d 305, 311 (5th Cir. 2017) (citation omitted). "A [plaintiff] must also show that the alleged defect was the cause-in-fact of his injury, as well as the 'most probable cause.'" *Rhodes*, 2019 WL 2162845, at *3 (quoting *Wheat v. Pfizer, Inc.*, 31 F.3d 340, 342 (5th Cir. 1994)).

---

[71] *See* R. Doc. No. 40-1, at 7–16. EMC does, however, make another argument potentially relevant to the design defect claim (based on Superior's potential liability for its installing the aluminum extension bar), which the Court addresses below.
[72] *Id.* at 16.

The McKinneys point to McCracken's expert report and testimony to argue that the van did not meet EMC's braking standards, which they argue constitutes a manufacturing defect. Those standards are based upon the federal motor vehicle safety standards, or "FMVSS."[73] That is, EMC's installation manual certifies that "the installation of all EMC products, as well as the performance of the modified vehicle, shall comply . . . with all applicable federal motor vehicle safety standards, FMVSS[.]"[74] EMC's corporate representative likewise testified that the AEVIT system, "if it was installed properly per the instructions, . . . should meet that standard."[75] That representative also admitted, however, that because no empirical testing was done (other than a fifty-mile test-drive) once the AEVIT system was installed in Bryce's van, EMC "do[es]n't know" whether the van *actually* met that standard.[76]

According to McCracken's report, FMVSS 105 requires a deceleration rate of "approximately 0.5g's"[77]—a point that EMC does not challenge.[78] However, based upon his analysis of the data, McCracken concluded that the "vehicle is only decelerating at a rate of approximately 0.2g's, which would be what a driver would apply while coming to a stop sign or stop light under very moderate non- emergency

---

[73] R. Doc. No. 58, at 14.

[74] R. Doc. No. 58-10, at 2 (EMC's installation manual).

[75] R. Doc. No. 58-1, at 24.

[76] *Id.*

[77] R. Doc. No. 40-8, at 6.

[78] *See* R. Doc. No. 68, at 9 ("[T]he braking requirement of . . . .5g set for [sic] in FMVSS 105."). As discussed next, EMC challenges McCracken's opinion that the van did not meet this standard, but it does not challenge that 0.5g is the level of braking that FMVSS 105 requires. *Id.*

[sic] braking."[79]   Based on that, and the fact that "[m]aintenance records on the McKinney van indicate that the brakes were recently inspected, by Ford dealerships, and found to be in good condition," McCracken concluded that the AEVIT system was to blame.[80]  This opinion was also based on the fact that neither EMC nor Superior conducted any accelerometer-based testing on the van as modified with AEVIT.[81] McCracken's ultimate conclusion was that, "[h]ad the McKinney van been able to pass FMVSS 105 (or even as low as 0.4g's deceleration) at the time of this accident the van would have stopped more than 80 feet short of the tree[.]"[82]

EMC's only response is that "McCracken has no foundation for his opinion that the van did not meet" EMC's braking standards.[83]  That is, FMVSS 105 requires 0.5g deceleration for braking only upon dry cement, not a stretch of travel that includes a combination of cement and grass, as here.[84]   And EMC points to McCracken's deposition, in which he admitted (at least according to EMC) "that he did not know the declaration [sic] rate of the McKinney van on dry pavement."[85]   Therefore, according to EMC, McCracken cannot opine as to whether the van satisfied FMVSS 105's requirements.

The Court first notes that an "operating or instruction manual can establish the requisite manufacturer's specifications or performance standards."  *Weams v.*

---

[79] R. Doc. No. 40-8, at 5.

[80] *Id.* at 6.

[81] *Id.*

[82] *Id.*

[83] R. Doc. No. 68, at 9.

[84] *Id.* (citing R. Doc. No. 68-1, at 4 (McCracken's deposition)).

[85] *Id.*

*FCA US L.L.C.*, No. 17-4, 2019 WL 960159, at *21 (M.D. La. Feb. 27, 2019) (citing *Reynolds v. Bordelon*, 172 So. 3d 607, 613 (La. 2015) and *Roman v. W. Mfg., Inc.*, 691 F.3d 686, 699 (5th Cir. 2012)).  Therefore, EMC's installation manual can establish the braking standard that EMC generally requires of AEVIT-equipped vehicles—*i.e.*, a deceleration rate of 0.5g, per FMVSS 105.

As for McCracken's conclusion that the van did not meet this standard: the Court concluded above that McCracken is qualified to testify as an expert in accident reconstruction.  He is therefore qualified to offer an opinion as to the braking capabilities of the van, so long as that opinion is based upon reliable methods and data.  And that opinion, based upon an analysis of the deceleration data recorded prior to the crash, is that the van failed to brake as specified.[86]  Moreover, EMC's argument that McCracken's testimony is unfounded ignores a key point of his analysis—that most of the van's braking "(3.8 out of 6.8 seconds) . . . occurred on the roadway surface."[87]  McCracken's conclusion, therefore, is not as unfounded as EMC makes it out to be.  At the very least, it is a factual matter of genuine dispute— something on which a jury could find for the McKinneys.

---

[86] McCracken's most compelling analysis on this point was stated in his expert report, in that the data indicates there was a roughly two-second lag between (1) when maximum braking was requested by Bryce through the hand controller and (2) when the anti-lock brakes were activated.  *See supra* notes 34–35 and accompanying text. As McCracken concluded, that isolates the AEVIT system as the likely culprit.  *Id.*

[87] R. Doc. No. 56, at 16 (citing R. Doc. No. 56-7, at 118).  And Superior's own expert agrees with McCracken's analysis in that, "if the brakes were applied sufficiently, if the demand was there . . . that . . . it should have been able to stop on the *pavement*." R. Doc. No. 75-1, at 14–15.

Because EMC makes no other arguments as to the McKinneys' manufacturing defect claim, the Court denies EMC's motion for summary judgment as to that claim.[88]

### 3.    *Causation*

Finally, EMC argues that, because Superior added an aluminum extension bar to the gas/brake controller, which EMC claims was a "change in design of the gas/brake system," "EMC cannot be liable for a design defect after such significant modifications pursuant to [La. Rev. Stat. §] 9:2800.54(C)."[89]  That statute provides:

> The characteristic of the product that renders it unreasonably dangerous under [La. Rev. Stat. §] 9:2800.55 must exist at the time the product left the control of its manufacturer. The characteristic of the product that renders it unreasonably dangerous under [La. Rev. Stat. §§] 9:2800.56 or 9:2800.57 must exist at the time the product left the control of its manufacturer or result from a reasonably anticipated alteration or modification of the product.

La. Rev. Stat. Ann. § 9:2800.54(C).

It is true that McCracken testified as to his lack of "any doubt about" whether the aluminum extension bar "contributed" to the accident.[90]  But that does not mean that he believes it was the *only* cause or defect.  Nor does it mean that the AEVIT

---

[88] The Court notes that an issue exists as to whether a design-defect claim *and* a manufacturing-defect claim may be simultaneously maintained against EMC as a matter of law.  Such could likely turn on how the "product" is defined; the McKinneys' manufacturing-defect theory implicitly argues that the product is the finished van with the AEVIT system installed—since they look to EMC's braking standards, which become relevant only when a vehicle is equipped with AEVIT and is therefore capable of braking through the use of the AEVIT system.  The Court is uncertain as to whether such a theory is supported by the caselaw, but because the parties have not briefed this issue, the Court will not address it here.

[89] R. Doc. No. 40-1, at 19–20.

[90] R. Doc. No. 58-2, at 60.

system was free of all defects at the time it left EMC's control.[91]  To the contrary, and as discussed at length above, McCracken offered numerous opinions as to how EMC defectively designed the AEVIT system.  Therefore, to the extent EMC argues that the addition of the bar was a separate, independent, and superseding cause,[92] which relieves it of *all* possible liability, that is inextricably intertwined with the jury question as to whether the product was defectively designed in the first place.  Should the jury so find, and also find that Superior's addition of the bar contributed to the accident, the question then becomes how fault should be apportioned.  *Cf. Mazant v. Visioneering Inc.*, 250 F. App'x 60, 63–64 (5th Cir. 2007) (reconciling special jury verdicts as to multiple allocations of fault).  Therefore, this argument does not provide a basis for summary judgment either.

## B.

As for Superior's motion for summary judgment "on the issue of legal causation,"[93] the Court notes that the plaintiffs maintain all four LPLA theories against Superior, as well as a negligence theory.[94]  The Court rejects Superior's arguments, finding that genuine issues of material fact remain as to each.

---

[91] Because the issue has not been briefed by the parties, and because it need not be addressed to resolve the present motions, the Court does not decide here at what point EMC was no longer in "control" of the AEVIT system.

[92] The Court does not read EMC's brief to necessarily argue as much, but the McKinneys' opposition memorandum treats the argument this way.  *See* R. Doc. No. 58, at 15–17.

[93] R. Doc. No. 45.

[94] R. Doc. No. 59, at 2 n.4; R. Doc. No. 45-2, at 7–8 (Superior's motion, acknowledging the negligence claim).

First, Superior argues that it is not a "manufacturer" of the AEVIT system and that it therefore cannot be held liable under the LPLA.[95]  But the LPLA includes in its definition of manufacturer anyone "who incorporates into the product a component or part manufactured by another manufacturer."   La. Rev. Stat. § 9:2800.53(1)(c).  And it is undisputed that Superior "installed" an aluminum bar and affixed it to the AEVIT's "gas/brake lever" so that Bryce could more easily reach it.[96]  Accordingly, Superior was, in part, a manufacturer of the AEVIT system.

Second, Superior argues that the aluminum extension bar did not cause the alleged braking failure; tellingly, it cites no evidence in the record for support.[97]  The McKinneys, on the other hand, point to the deposition of EMC's corporate representative, who testified that the bar was "a very poorly . . . designed modification."[98] And McCracken opined in his report that this "plate added additional stress and torque to the gas/brake controller which was not anticipated by EMC, and may have contributed to the loss of control which occurred during this accident sequence."[99]  The Court finds that whether the bar's addition caused the alleged braking failure is a genuine issue of material fact.

---

[95] *Id.* at 6–7.
[96] *Id.* at 7 ("Strowmatt designed the [aluminum bar] modification and Superior installed the modification.").
[97] *Id.*
[98] R. Doc. No. 59-2, at 8.
[99] R. Doc. No. 59-3, at 4.

Finally, Superior says it cannot be held liable under a theory of negligence.[100] It points (somewhat confusingly) to its arguments as to the aluminum bar and that the "[p]laintiffs have no evidence that the OEM braking system, including the ABS, were not operating as intended through the inputs by Bryce McKinney to the gas/brake lever."[101]  As just discussed, there is a genuine issue of material fact as to whether the aluminum extension bar contributed to the van's braking failure.  And, as discussed above, McCracken concluded that the AEVIT roller was improperly aligned with the van's brake pedal, which impaired the van's braking.  He also concluded that, due to the irregular wear on the roller, Superior improperly installed it.  Whether that is true—a factual issue central to Superior's liability—is for the jury to decide.  Resolution of these issues will turn on whether the jury finds the McKinneys' or the defendants' experts more credible; they are not fit for resolution on summary judgment.

## V.   CONCLUSION

Accordingly,

**IT IS ORDERED** that EMC's and Superior's motions[102] *in limine* to exclude McCracken's expert testimony are **DENIED**.

---

[100] R. Doc. No. 45-2, at 7–8.  Superior did not join EMC's motion for summary judgment as to the negligence claim based on the LPLA's exclusivity provision, and the Court expresses no opinion on that issue here.

[101] *Id.* at 8.

[102] R. Doc. No. 44; R. Doc. No. 37.

**IT IS FURTHER ORDERED** that EMC's motion[103] *in limine* to exclude evidence or testimony of other accidents or lawsuits involving EMC is **DISMISSED WITHOUT PREJUDICE** to its being re-urged at trial.

**IT IS FURTHER ORDERED** that EMC's and Superior's motions[104] for summary judgment are **DENIED**.

New Orleans, Louisiana, April 28, 2021.

_____
**LANCE M. AFRICK**
**UNITED STATES DISTRICT JUDGE**

---

[103] R. Doc. No. 48.
[104] R. Doc. No. 40; R. Doc. No. 45.